[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION ON PLAINTIFF'S APPLICATION FOR PREJUDGMENT REMEDY
Plaintiff in these consolidated cases has made application for a prejudgment remedy in connection with certain allegedly defective and inadequate materials and/or workmanship at South Mill Village ("South Mill"), a common interest community located in Glastonbury. Plaintiff ("the Association") is a unit owners association as defined in Section 47-202(3). The defendant, Still Hill Development Corporation ("SHDC") is the declarant of South Mill as defined in Connecticut General Statutes Section 47-202(12). The defendant, Edward Kamis. Sr., served as an officer of the declarant corporation at relevant time periods and has been a principal owner of declarant. Plaintiff seeks the issuance of a prejudgment remedy against SHDC and Edward Kamis, Sr., in the amount of approximately $612,000. Plaintiff's application is supported by an August 6, 1996, affidavit of Paul Pronsky, the treasurer and a director of the plaintiff. An evidentiary hearing was held on March 17, 18, and 20. Briefs were filed and have been analyzed.
I will not attempt to set out the facts in detail as developed at the hearing, but will generally confine myself to a discussion of facts directly relevant to the probable cause issue.
In summary, Mr. Kamis is a general contractor who has built luxury homes in the Glastonbury area. According to his testimony. South Mill was his first condominium venture, involving 262 approved units, of which 65 have been built and sold since 1985, at sales prices ranging from $140,000 to $290,000. John Woolley, chairman of the plaintiff's building committee, testified that the plaintiff took over control and operation of the condominium complex in 1994 and 1995.
To simplify, the principal allegations in plaintiff s complaint for purposes of the pending prejudgment remedies application are that the roof systems on the units, the roads, and other common elements are inadequate and/or defective, breaching express warranties to unit purchasers pursuant to Connecticut General Statutes Section 47-274[1], and implied warranties by virtue of Connecticut General Statutes Section 47-275(b)[2]. There are related claims concerning expenditures for painting as well.
Legal Principles
Before briefly summarizing the relevant evidence produced at the hearing, a cursory review of the well-known principles which CT Page 5210 relate to applications for prejudgment remedies is appropriate.
A prejudgment remedy shall be granted if a judge determines that there is "probable cause" to sustain the validity of the plaintiffs claim. General Statutes Section 52-278d. "Probable cause" is a bona fide belief in the facts essential under the law for the action and such as would warrant a person of ordinary caution, prudence and judgment in advancing the action. Tyler v.Schnable, 34 Conn. App. 216, 220 (1994). The belief does not have to be correct or more likely true than false. Three S.Development Company v. Santore, 193 Conn. 174, 175 (1984). To establish "probable cause," a plaintiff need only show the "probable validity" of his or her claim. Probable cause must exist as to both the merits and as to damages. "Probable cause" is a flexible, commonsense standard, and it is not necessary for plaintiff to prove the case by a fair preponderance of the evidence at the probable cause stage. McCahill v. Town CountryAssociates. Ltd., 185 Conn. 37, 39 (1981); Self-Service SalesCorp. v. Heinz, 1 Conn. App. 188, 194 (1984). A probable cause hearing is not intended to be a full scale trial on the merits of the plaintiff s claim. Three S. Development Company, supra, at 175. The principal focus of the probable cause hearing is to determine whether and to what extent a plaintiff is entitled to have property of a defendant held in custody of law pending adjudication of the merits. Tyler v. Schnabel, supra. at 219.
In ruling on an application for a prejudgment remedy, the court must consider available defenses, counterclaims, and setoffs. General Statutes Section 52-278d(a)(1). However arguments as to possible outcomes do not substitute for evidence in support of those arguments because in ruling or an application for a prejudgment remedy, the court is limited to the evidence produced at the hearing.
In summary, the probable cause determination is a limited one based on limited evidence. Particularly in a case such as this, it ought not to be viewed as an inevitably reliable guidepost to what will occur at a full trial, where the evidence and the legal arguments are explored in much greater detail and subjected to a higher level of scrutiny by the parties, the court, and the trier of fact, and where a more demanding standard of proof applies.
Roof
With respect to the roof claim, the testimony produced at the CT Page 5211 hearing persuades me that plaintiffs have established that there is probable cause as to their claim that the workmanship associated with the roof system was defective, and that the roofs generally were not constructed in accordance with sound engineering and construction standards (Second Count) as required by Section 47-275(b). See Plaintiff's Memorandum of Law in Support of Application for Prejudgment Remedy, pages 4 through 9.
Specifically. John Woolley, unit owner of unit 105 and chairman of the building committee, testified as to roof problems in his unit, roof leaks reported by other unit owners and temporary measures initially undertaken to fix the problems. TR. 3/17/98. pages 9-13. Mr. Woolley testified that the roofs on all 65 units had been replaced, including some roofs which had experienced no problems. Tr, 3/17/98, pages 45-59. According to Mr. Woolley, 30 of 37 unit owners who responded to a survey reported roof problems. Tr. 3/17/98, page 53. He testified that roof problems included lack of underlayment and faulty, workmanship, contributing to shingles failing and blowing off roofs. Tr. 3/17/98, pages 47-48. Mr. Woolley also testified that the ventilation system on the roofs had been improved when the roofs were replaced, and estimated that this cost would not be more than 5 percent of the cost of installing the new roofs. Tr. 3/17/98, page 57.
C. Arthur Boothby of Imagineers, the property manager for the units, testified that he had been inside at least 39 of the 65 units (approximately 60 percent) and had seen evidence of roof leaks. Tr. 3/18/98, pages 154-177. He testified that painting costs to correct interior stains caused by defective roofs was "about $14,000." and anticipated that another $4,000 to $5,000 would be required to finish the work. Tr. 3/18/98. pages 178, 211. He also said that 50 of 65 units had leaked. Tr. 3/18/98, page 207.
Most significantly. Herbert Fishman, an expert in roofing with many years of experience, testified at length, providing the only expert testimony at the hearing concerning the roofs.Schaefer. Jr. Co. v. Ely, 84 Conn. 501 509 (1911). I have reviewed Mr. Fishman's testimony and find it to be credible.
I will not attempt to summarize it in detail. However, Mr. Fishman provided uncontradicted testimony that the workmanship was faulty, and that the roof systems were not constructed in accordance with sound engineering and construction standards, CT Page 5212 because, among other things, the shingles in all the units were nailed in improperly. creating a high susceptibility to wind damage, see Tr. 3/18/98, pages 261-263, and because there was a lack of underlayment, which was required by standard practice. Mr. Fishman's report, dated November 17, 1995, and a revised report, dated June 13, 1996, were admitted into evidence as Exhibits 3 and 6 respectively.
Mr. Fishman's revised report states as follows in relevant part:
5.0 RECOMMENDATION and CONCLUSIONS
 5.1 The roofs on the complex will continue to leak during extreme weather and when ice and snow are on the roofs.
 5.1.1 The major factor in contributing to the leakage is absence of underlayment and Ice and Watershield.
5.1.2 The next most important factor is poor workmanship.
 5.3 The roofs are susceptible to wind damage because of improper nailing.
 5.8 A plan should be made for the replacement of the remainder of the roof, cluster by cluster.
Mr. Fishman also testified that the applicable national standard, based on his experience, required the use of underlayment on condominium roofs of the kind in question. Tr. 3/20/98, pages 319-326. He also testified that he had reviewed shingle instructions from the relevant time periods created by Elk, the manufacturer of the shingles. and concluded, based in part on the review, that the instructions contemplated the use of underlayment. Tr. 3/20/98, pages 326-332. See defendant's Exhibit C, Elk Roofing Products brochure. He testified that only a few roofs had underlayment.
Mr. Fishman also testified that the roofs did not have proper ice dam protection. See, e.g., Tr. 3/20/98, page 357.
He offered the opinion that the roofs were installed negligently, because "they did not have the proper ice dam protection," because they did not have underlayment as called for in the Elk literature and applicable codes, and because the shingles were nailed high and penetrated a particular shingle CT Page 5213 four times, not eight, creating susceptibility to wind damage. Tr. 3/20/98, pages 357-358.
The evidence indicated that the Association had spent $258,000 to replace all of the roofs, plus change orders of $8,792. Plaintiff's Exhibit 1.
Defendants make a number of arguments in opposition to the roof claim. See defendants' Post Hearing Brief in Opposition to Plaintiff's Prejudgment Remedy Application, dated March 31, 1998. They argue that Mr. Fishman's initial report (Plaintiff's Exhibit 3) erroneously stated, at Section 3.2.2, that the lack of underlayment was "a serious violation of the building code." This statement was corrected in the revised report. Plaintiff's Exhibit 6. However, Mr. Fishman's uncontradicted testimony made it clear that his opinion that the roofs were defective was based on a variety of factors, including other applicable standards and his substantial experience.
Defendants also argue that the roofs have had a useful life of approximately one-third of the thirty years referenced on the last page in the South Mill Village sales brochure, Plaintiff's Exhibit 13, which refers to a "30-year roof guarantee roof shingles." Defendant's argument appears logical, but it lacks evidentiary support. Whether this argument, if supported by evidence and/or expert testimony, persuades the jury, v at trial to reduce the damages it may choose to award, if any, remains to be determined. For purposes of a probable cause determination, however, the argument has some appeal but is not ultimately persuasive.
In sum, on review of the full record, including the uncontradicted testimony of Mr. Fishman, I conclude that plaintiffs have made a showing of probable cause that many of the roofs were not constructed "according to sound engineering and construction standards, and in a workmanlike manner." as required by Section 47-275. Bosco v. Arrowhead By the Lake. Inc.,1994 WL 389034 (Conn. Super 1994). See also LaBella v. Charlie Thomas.Inc., 942 S.W.2d 127 (Tex.Ct.App. 1997); Genetics Research v.J.K. Mill-Iron Ranch, 535 N.W.2d 839 (S.D.Sup.Ct. 1995).
With respect to the issue of damages relating to the roof, defendant argues that the evidence does not demonstrate that all
of the roofs required complete replacement. I agree. The record makes it clear that while there were significant problems with CT Page 5214 many of the roofs, not every roof experienced leaks, and that some of the roofs which were replaced suffered no leaks. The burden of proving losses and damages rests on the party claiming them. Gargano v. Heyman, 203 Conn. 616, 620 (1987). Mathematical exactitude is not required in proving damages. Hassane v.Lawrence, 31 Conn. App. 723, 727 (1993). Where damages are inherently difficult to prove, a plaintiff must prove damages with the precision which the facts permit, but no more. Johnsonv. Healy, 183 Conn. 514, 515 (1981). However, a damages finding must be grounded in the evidence, and cannot be based on speculation or surmise.
Having considered this matter, I am persuaded that the most logical and appropriate approach with respect to the roofs is to make a finding as to the roofs inspected by Mr. Boothby having identifiable leak problems. Therefore, for probable cause purposes only, I conclude that an attachment relating to the roofs should amount to: 60% of the cost of replacing all of the roofs ($258,000), 60% of the change orders ($8792), and 60% of the amount spent on painting associated with the roofs, or to be spent on the roofs (approximately $18,000); or 60% of $284,792, which amounts to $170,875.20. This amount should be diminished by 5 percent, for ventilation improvements, bringing the number down to $162,331.44; and diminished again by $20,340.00, which Paul Pronsky concedes in his August 6, 1996, affidavit represents the reasonable value of the use of the existing roof shingles, reducing the amount to $141,991.44. This amount should be increased by the full value of the services rendered by Mr. Fishman for his reports and testimony (about $40,000, including amounts owed him). increasing the total to $181,991.44.
Roads
Review of the evidence leads me to conclude that plaintiff has also established probable cause with respect to the claim that the condition of some of the roads violated the implied warranty of quality found in General Statutes Section 47-275(b). The uncontradicted testimony produced by plaintiff establishes probable cause to believe that some of the roads — in particular, those characterized by significant "alligatoring" — are not suitable for the ordinary use of roads of their type, and that they are not constructed according to sound engineering and construction standards and in a workman-like manner. Bosco v. Arrowhead By the Lake. Inc., 1994 WL 389034
(Conn.Super. 1994). CT Page 5215
Specifically, uncontradicted testimony was given that there are signs of substantial failures in the roads, most prominently evidenced by the above mentioned "alligatoring," e.g. numerous interrelated cracks in the roads. Tr. 3/17/98. testimony of John Woolley, at 29-36: see Plaintiff's Exhibit 4, photograph 2. C. Arthur Boothby of Imagineers testified that he estimated the square footage of South Mill's roads to be over fifty, but less than sixty thousand square feet. Tr. 3/18/98, testimony of C. Arthur Boothby. at 191-92. Mr. Kamis testified that Still Hill had subcontracted out almost all of the work in connection with the development. Tr. 3/20/98, testimony of Edward J. Kamis at 366.
A testing laboratory was hired to do a study and Edward F. Sarisley, a civil and structural engineer, was hired to do a survey of the condition of access drive pavement at South Mill Village. See Plaintiff's Exhibit 4. He caused some 16 pavement samples to be taken throughout the complex, and analyzed the samples, evaluating the pavement thickness and the base and sub-base materials. He expressed the opinion that portions of the pavement was in "severe distress," and that the "alligatored" areas represented "the last and most severe form of distress pavement." See Tr. 3/18/98 at 93 through 110. In the conclusion of his report, he stated that "It is clear that the prevailing undersized pavement thickness is the primary reason for the severe cracking problems and premature failure." He testified on cross-examination that some of the roads had "failed," and that "Once the pavement is alligator cracked it is already over the cliff." Tr. 3/18/98 at 144.
On cross-examination, Mr. Sarisley was asked about a maintenance program for the roads, in contradistinction to a complete replacement of them, and stated that "We do not know" the limits of the inadequate pavement at this point. Tr. 3/18/98 at 146.
With respect to damages, consequently, the record does not provide a reliable factual basis upon which the court can evaluate (a) the full extent of the road problem, e.g., precisely how widespread it is; and (b) the cost of fixing any such problem, including the cost of remedying the apparent problems, short of a full road replacement, if possible. McCahill v. Town Country Associates. Ltd., 185 Conn. 37, 39 (1981).
Therefore, the damages as to the road issue for the purposes CT Page 5216 of this hearing are limited to the cost of Mr. Sarisley's report and testimony, totaling $1800, and the $2340 (Exhibit 14) the Association was billed by the independent testing laboratory, for a total of $4,140. Of course, whether substantial damages can be proven — and if so, in what amount — must await trial in this case.
Additional Painting Cycle
I agree with the defendants that plaintiff has failed to establish probable cause in connection with its claim that an additional painting cycle was incurred as a consequence of defendants' alleged conduct. The evidence at the hearing was simply too speculative, and unsupported by documentation, to find for plaintiff on this claim.
Conclusion and Summary
For the reasons stated, a prejudgment remedy shall issue against Still Hill Development Corp. and Edward Kamis. Sr., only in the amount of $186,131.44.
It is appropriate to underline what is stated in general terms above — that this is a limited finding based on the evidence produced at the probable cause hearing. The parties are cautioned that a fullblown trial — involving other witnesses and fuller exploration of the many legal issues involved — could in the view of the undersigned judge produce significantly different and unpredictable results on these issues, as well as others which were not presented at the hearing. The possibility of evaluating what will occur at trial in this case is limited, given the many legal and factual issues which exist as to both liability, and damages, presenting high risks for the parties. They are therefore urged to consider alternative methods of resolving this dispute.
The effect of this ruling shall be stayed until May 12, 1998 to give the pe parties time to attempt to decide what property should be subject to attachment. Counsel shall jointly contact the court, in writing, to request a hearing if they are unable to reach agreement.[3]
Douglas. S. Lavine J.
Endnotes
CT Page 5217